**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

_____

|  |  |  |
|---|---|---|
| CATTARAUGUS COUNTY SCHOOL EMPLOYEES FEDERAL CREDIT UNION, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | Case No.: |
| Plaintiff, | ) ) ) | |
| | ) ) | **COMPLAINT-CLASS ACTION JURY TRIAL DEMANDED** |
| v. | ) ) ) | |
| HOME DEPOT U.S.A., INC. | ) ) | |
| Defendant. | ) ) | |

_____ )

Plaintiff Cattaraugus County School Employees Federal Credit Union,

individually and on behalf of similarly situated financial institutions, files this

Class Action Complaint against Defendant Home Depot U.S.A., Inc. ("Defendant"

or "Home Depot").

## SUMMARY OF ACTION

### 1.

Between approximately April and September, 2014, the sensitive financial

data—including, but not limited to, customers' names, credit and debit card

numbers, card expiration dates, and card verification values—of 56 million shoppers was compromised as a result of Home Depot's failure to adequately secure payment information on its data systems.[1] Experts believe it may be the largest data security breach in United States history, yet Home Depot's security protocols were so deficient that the breach continued for more than four months while Home Depot failed to even detect it.

## 2.

The Home Depot breach involved substantially the same techniques as those used in other significant data breaches which have occurred in the preceding months and years. Despite having knowledge that such breaches were occurring throughout the retail industry, the Company failed to properly protect the sensitive card information from what is now a widely known, preventable method of cyber-attack.

## 3.

The financial institutions that issued the debit and credit cards involved in Home Depot's data breach have suffered, and will continue to suffer, substantial losses as a result of Home Depot's failure to adequately protect its sensitive payment data. This includes, but is not limited to, sums associated with notifying customers

---

[1] Matt Townsend, *Home Depot Says Data Hack Affected 56 Million Payment Cards*, BLOOMBERG, Sept. 18, 2014, http://www.bloomberg.com/news/2014-09-18/home-depot-says-data-breach-affected-56-million-payment-cards.html.

of the data breach, reissuing debit and credit cards, reimbursing customers for fraudulent transactions, monitoring customer accounts to prevent fraudulent charges, and addressing customer confusion, complaints, and changing or canceling of accounts.

4.

Plaintiff seeks to recover damages and equitable relief on behalf of itself and all other similarly situated financial institutions in the United States.

**JURISDICTION AND VENUE**

5.

This Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) the FI Class consists of more than 100 members; (2) the amount at issue is more than $5 million exclusive of interest and costs; and (3) minimal diversity exists as at least one plaintiff is a citizen of a different state than Defendant.

6.

This Court has jurisdiction over Home Depot because the company maintains its principal headquarters in Georgia, regularly conducts business in Georgia, and has sufficient minimum contacts in Georgia. Home Depot purposefully avails itself

of this jurisdiction by marketing and selling products from Georgia to millions of consumers nationwide (including in Georgia).

7.

Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(a) because Defendant's principal place of business is in this District and, furthermore, because a substantial part of the events, acts, or omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

8.

Plaintiff Cattaraugus County School Employees Federal Credit Union is a not-for-profit, member-owned, financial cooperative based in Salamanca, New York.

9.

Plaintiff provided customers with credit and/or debit cards equipped with magnetic stripes containing sensitive financial data.  Plaintiff's customers used these cards to engage in financial transactions with Home Depot stores.

10.

As a result of the data breach, Plaintiff was required to spend thousands of dollars for, among other things, the cost of replacement cards and covering the cost

of fraudulent transactions.  These costs are ongoing, as Plaintiff continues to investigate fraudulent transactions resulting from the data breach that have not yet been reimbursed.

## 11.

Defendant Home Depot is a Delaware corporation with its principal place of business located at 2455 Paces Ferry Road N.W., Atlanta, Georgia 30339.

## STATEMENT OF FACTS

## 12.

Home Depot is an international retail chain and the largest retailer of home improvement and construction products and services in the world with 2,266 store locations. Between approximately April 2014 and September 8, 2014, in one of the largest data breaches in history, the Company's computer systems were compromised and hackers obtained the financial information of an estimated 56 million Home Depot shoppers.

## 13.

Information obtained by investigative journalists, security experts, and former employees shows the data breach easily could have been prevented as Home Depot failed to take adequate and reasonable measures to ensure its data systems were protected, ignored numerous clear warnings that its data systems were outdated and

thus vulnerable to attack, and failed to take actions that could have thwarted the breach. Because of Home Depot's numerous and preventable failures, Plaintiff and the FI Class have suffered, and will continue to suffer, millions of dollars in damages.

14.

Through its action and inaction, Home Depot has violated common laws designed to prevent such disasters, and those violations have caused Plaintiff and the FI Class to suffer substantial damages.

**Background on Electronic Debit and Credit Card Transactions**

15.

When a customer initiates a debit or credit card transaction at a retailer such as Home Depot, as with virtually all credit or debit card transactions made on a credit card network, the process of completing the transaction involves four principal actors:  (1) a merchant (such as Home Depot), where the initial purchase is made; (2) an acquiring bank (which is typically a financial institution that contracts with the merchant to process its credit and debit card transactions); (3) a payment processor or card network (the system through which the transaction is conducted, *e.g.* Visa or MasterCard); and (4) the credit or debit card issuer (which is a financial institution like Plaintiff and members of the FI class that issues credit and debit cards

to consumers). Generally, to process a purchase using a credit or debit card, a merchant first seeks authorization from the issuing bank for the transaction. In response, the issuing bank informs the merchant whether it will approve or decline the transaction (generating the familiar "transaction approved" or "card declined" message at the point of purchase). Assuming the transaction is approved, the merchant then electronically forwards the recipient directly to its acquiring bank. The acquiring bank then pays the merchant (*i.e.*, Home Depot), forwards the final transaction data to the issuing bank, and the issuing bank reimburses the acquiring bank. The issuing bank (*i.e.*, Plaintiff) then posts the charge to its customer's credit or debit card account.

16.

Given the extensive network of financial institutions involved in retail transactions, and the sheer volume of daily transactions using credit and debit cards, it is unsurprising that financial institutions and credit card processing companies have issued rules and standards governing the basic measures that merchants must take to ensure that valuable transactional data is protected. First, the credit and debit card companies issue regulations ("Card Operating Regulations") that are enforceable upon Home Depot as a condition of Home Depot's contract with its acquiring bank. The Card Operating Regulations prohibit Home Depot (or any

merchant) from disclosing any cardholder account numbers, personal information, magnetic stripe information, or transaction information to third parties other than the merchant's agent, the acquiring bank, or the acquiring bank's agents. Under the Card Operating Regulations, Home Depot was required to maintain the security and confidentiality of credit and debit cardholder information and magnetic stripe information and protect it from unauthorized disclosure.

17.

Similarly, the Payment Card Industry Data Security Standards ("PCI DSS") are a list of twelve information security requirements promulgated by the Payment Card Industry Security Standards Council. They apply to all organizations and environments where cardholder data is stored, processed, or transmitted and require merchants like Home Depot to protect cardholder data, ensure the maintenance of vulnerability management programs, implement strong access control measures, regularly monitor and test networks, and ensure the maintenance of information security policies. Specifically, the PCI DSS 2.0 requires merchants to adhere to the following rules:

**Build and Maintain a Secure Network**

- Install and maintain a firewall configuration to protect cardholder data

- Do not use vendor-supplied defaults for system passwords and other security parameters

**Maintain a Vulnerability Management Program**

- Use and regularly update anti-virus software or programs

- Develop and maintain secure systems and applications

**Implement Strong Access Control Measures**

- Restrict access to cardholder data by business need-to-know

- Assign a unique ID to each person with computer access

- Restrict physical access to cardholder data

**Regularly Monitor and Test Networks**

- Track and monitor all access to network resources and cardholder data

- Regularly test security systems and processes

**Maintain an Information Security Policy**

- Maintain a policy that addresses information security for all personnel

**Protect Cardholder Data**

- Protect stored cardholder data

- Encrypt transmission of cardholder data and sensitive information across public networks

18.

Home Depot was at all times fully cognizant of its data protection obligations in light of the existing panoply of regulations and industry standards requiring Home Depot to take affirmative steps to protect the sensitive financial information entrusted to it by consumers and the financial institutions that participate in and administer credit and debit card processing systems.

19.

Despite this, Home Depot's treatment of the sensitive financial information entrusted to it by its customers and Plaintiff fell woefully short of its legal duties and obligations. Home Depot failed to ensure that its data systems were up-to-date, and failed to acknowledge numerous warning signs that, had they been heeded, would have detected and prevented this exact type of attack.

**Leading Up to the Breach:  Home Depot's Warnings**

20.

Prior to the breach, Home Depot had notice of the vulnerability of its data systems, and of the potential risks posed to the Company and to financial institutions such as Plaintiff and the FI Class if it failed to adequately update and protect its systems.

21.

Specifically, Home Depot knew of numerous deficiencies with respect to its point-of-sales systems (the place where a retail transaction is completed). Home Depot's failure to address and remedy these deficiencies allowed the breach to occur, as hackers focused their attack on the Company's under-protected point-of-sales systems.

22.

The deficiencies in Home Depot's data security systems included, but were not limited to, a lack of such basic security measures that even the most inexperienced Information Technology professional would have identified it as problematic.

23.

Despite numerous warnings of these deficiencies, Home Depot failed to take any remedial action for five years. Home Depot's culture of inaction is well documented.

24.

As early as 2009, data security experts urged Home Depot to install encryption technology to fix a flaw that existed, and continues to exist, with respect to magnetic

stripe credit or debit cards.[2] The flaw makes card data vulnerable for a brief moment as it passes into a retailer's payment systems' memory after the card is swiped.[3] The flaw was exploited by hackers in the Home Depot data breach, thus had the flaw been addressed and eradicated in 2009, the breach could have been entirely prevented.

25.

Home Depot, however, did not implement the encryption technology in 2009. In fact, Home Depot waited some five years to begin to implement the technology. Such delayed decision-making led one security expert to conclude: "What's unreasonable is this was a 2014 decision."[4] This was the first example of Home Depot's culture of inaction.

26.

In 2011, Home Depot failed to properly update its antivirus software for its point-of-sale systems, despite pleas from security staffers to purchase new software.[5]

---

[2] Danny Yadron & Shelly Banjo, *Home Depot Upped Defenses, But Hacker Moved Faster*, WALL ST. JOURNAL, Sept. 12, 2014, http://online.wsj.com/articles/home-depot-upped-defenses-but-hacker-moved-faster-1410564218.

[3] *Id*.

[4] *Id*.

[5] Michael Riley et al., *Former Home Depot Managers Depict 'C-Level' Security Before the Hack*, BLOOMBERG BUSINESSWEEK, Sept. 12, 2014, http://www.businessweek.com/articles/2014-09-12/home-depot-didnt-encrypt-credit-card-data-former-workers-say.

At the time, Home Depot was using software called Symantec Endpoint Protection 11, which was released in 2007.[6] Symantec in 2011 released a new version of the software because, according to the company, the "threat landscape has changed significantly" and the new product would better protect against the "explosion in malware scope and complexity."[7]

27.

Despite this clear indication of the need for new antivirus software, Home Depot did not purchase it, and instead stayed with its outdated, subpar software. In fact, Home Depot was still using the outdated software at the time of the breach. This decision not only put the Company's point-of-sale systems at significant risk, it also violated PCI DSS standards. This was the second example of Home Depot's culture of inaction.

28.

Between 2011 and 2014, security managers at Home Depot attempted on numerous occasions to make improvements to the Company's security systems.[8] These attempts were thwarted, however, by Home Depot executives, namely

---

[6] *Id*.
[7] *Id*.
[8] *Id*.

information security chief, Jeff Mitchell.[9] In fact, according to two former managers, Mitchell created a culture of complacency at Home Depot, telling staffers to settle for "C-level security" (as opposed to A-level or B-level) because "security upgrades would be costly and might disrupt operation of critical business systems."[10] Had the improvements been implemented by Home Depot instead of being ignored, the breach would likely have been prevented.

29.

The managers were particularly concerned with the lack of encryption for credit and debit card data at point-of-sales systems in Home Depot stores.[11] Despite being apprised of this issue in 2011, Home Depot failed to even begin to address it until 2014, leaving the point-of-sales systems vulnerable to attack for some five years. This was the third example of Home Depot's culture of inaction.

---

[9] *Id.*
[10] *Id.*
[11] *Id.*

30.

In 2013, Home Depot suffered two smaller data hacks.[12] The hacks penetrated Home Depot's payment systems which put, or should have put, the Company on notice of the systems' vulnerability.

31.

After the hacks, between August, 2013 and February, 2014, Home Depot's own security contractors urged the company several times to strengthen its cyber-defenses by taking the basic step of turning on a key security feature of the Company's security software.[13]

32.

Instead, Home Depot chose to keep the extra security measure deactivated "even though it was specifically designed to spot the kind of malicious software that attacks payment systems' endpoints, like the registers that were hit at Target, Michaels, Nieman Marcus, and others."[14] This was the fourth example of Home Depot's culture of inaction.

---

[12] Michael Riley et al., *Home Depot Hacked After Months of Security Warnings*, BLOOMBERG BUSINESSWEEK, Sept. 18, 2014, http://www.businessweek.com/articles/2014-09-18/home-depot-hacked-wide-open.
[13] *Id.*
[14] *Id.*

33.

Home Depot resisted activating the intrusion prevention feature, according to two former Home Depot information security managers, because their direct supervisor told them to "minimize costs and system downtime at the expense of improving security."[15]

34.

On October 1, 2013, a report prepared for Home Depot by consultant FishNet Security informed the Company in no uncertain terms that its current data security practices were putting its computers at significant risk.[16] According to the report, Home Depot had switched off the firewall protection of its Symantec Network Threat Protection ("NTP") software in favor of a Windows product.[17] FishNet made clear the imprudence of Home Depot's decision, saying: "It is highly advised and recommended that the NTP Firewall component be deployed and that Windows Firewall be discontinued."[18]

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

35.

Despite this clear and unequivocal warning, Home Depot did not adopt FishNet's recommendation. Instead, the Company kept the much needed protection off its registers, thereby keeping them at risk of being hacked. This was the fifth example of Home Depot's culture of inaction.

36.

In early 2014, the Federal Bureau of Investigation alerted retailers, including Home Depot, to be more vigilant about identifying and preventing point-of-sales attacks.[19]

37.

Home Depot again disregarded this warning, leaving its deficient point-of-sales systems unchanged and thus vulnerable to attack. This was the sixth example of Home Depot's culture of inaction.

38.

Finally, after five years of inaction, Home Depot's culture of complacency came to a halt in early 2014, but only in the aftermath of the Target data breach.

---

[19] Joe Nocera, *Criminal Card Games*, N.Y. TIMES, Sept. 15, 2014, http://www.nytimes.com/2014/09/16/opinion/joe-nocera-criminal-card-games.html.

39.

After the Target breach became public in late 2013, senior executives at Home Depot assembled a task force to draw up a plan to guard against a similar attack.[20] In what can only be characterized as an admission of the woeful deficiencies in Home Depot's data systems, deficiencies the Company had known about for five years, the task force came up with numerous security recommendations.[21]

40.

The task force's recommendations mirrored those previously offered by security experts and former security staffers, recommendations that had fallen on deaf ears due to Home Depot's culture of prioritizing savings over security.

41.

The recommendations were not made proactively with the interest of customer data security in mind, but rather as an attempt to cover up Home Depot's well-documented history of ambivalence and inaction with respect to data systems security.

---

[20] Riley et al., *supra* note 5.
[21] *Id.*

42.

Home Depot's security shortcomings run contrary to best practices and industry standards. Specifically, the Company's practices directly conflict with the PCI DSS, including the twelve core security standards. All merchants are required to adhere to the PCI DSS in order to be a member of the payment card industry.

43.

Home Depot's negligent conduct is best summed up by a recent *Newsweek* article on the breach – "[t]he bottom line:  Hacked retailer Home Depot repeatedly failed to heed its own security team's warnings to boost its data protections."[22]

**Home Depot's Unprecedented Security Breach**

44.

On or about late April 2014, the Home Depot data breach began.[23]

45.

In July 2014, while the data breach was in full swing, a "health check" of Home Depot's information systems identified out-of-date malware-detection systems.[24]

---

[22] Riley et al., *supra* note 12.
[23] Brian Krebs, *Banks:  Credit Card Breach at Home Depot*, KREBS ON SECURITY, Sept. 2, 2014, http://krebsonsecurity.com/2014/09/banks-credit-card-breach-at-home-depot/.
[24] Riley et al., *supra* note 5.

46.

The results of the health check should have caused Home Depot to immediately spring into action, which could have led to the Company discovering the data breach. Instead, the check was ignored, and the breach continued uninterrupted for two more months.

47.

In total, the breach lasted for five months and went wholly unnoticed by Home Depot.[25]

48.

On September 2, 2014, the breach finally ended when it was discovered by noted security blogger Brian Krebs, not Home Depot.[26]

49.

Also on September 2, 2014, after Krebs broke the story, Home Depot refused to confirm whether a breach had occurred. Instead, the Company merely declared it was looking into "unusual activity," and that it would "provide further information as soon as possible."[27]

---

[25] Nicole Perlroth, *Home Depot Data Breach Could Be the Largest Yet*, N.Y. TIMES, Sept. 8, 2014, http://bits.blogs.nytimes.com/2014/09/08/home-depot-confirms-that-it-was-hacked/.
[26] Krebs, *supra* note 23.
[27] *Id.*

50.

Finally on September 2, 2014, Krebs reported that two massive new batches of stolen cards had been uploaded onto the Internet website rescator[dot]cc, an online, underground store notorious for selling stolen credit and debit cards.[28] Krebs believed the new batches were cards which had been stolen in the Home Depot breach.

51.

On September 3, 2014, Krebs confirmed that the breach occurred at nearly all Home Depot store locations in the United States.[29] Krebs came to this conclusion by comparing the ZIP code data between the unique ZIP codes represented on Rescator's site and those of the Home Depot stores. The overlap was a "staggering 99.4 percent."[30] As a noted security expert put it:  "A 99+ percent overlap in ZIP codes strongly suggests that this source is from Home Depot."[31] Despite this evidence, Home Depot still refused to confirm a data breach had occurred.

---

[28] *Id.*

[29] Brian Krebs, *Data:  Nearly All U.S. Hope Depot Stores Hit*, KREBS ON SECURITY, Sept. 3, 2014, http://krebsonsecurity.com/2014/09/data-nearly-all-u-s-home-depot-stores-hit/.

[30] *Id.*

[31] *Id.*

52.

Between September 4 and September 8, 2014, Krebs reported a sharp uptick in debt card fraud reported by banks.[32] The fraud, which in one case was upwards $300,000 in just two hours, could be traced back to cards that had all been recently used at Home Depot.[33] Despite this evidence, Home Depot still refused to confirm a data breach had occurred.

53.

Finally, on September 8, 2014, after six days of silence, Home Depot confirmed a data breach had occurred involving its United States and Canadian stores.[34]

54.

Home Depot's delayed response to the breach was widely criticized by industry experts. One expert concluded:  "Honestly, Home Depot is in trouble here … This is not how you handle a significant security breach."[35]

---

[32] Brian Krebs, *In Wake of Confirmed Breach at Home Depot, Banks See Spike in PIN Debit Card Fraud*, KREBS ON SECURITY, Sept. 4, 2014, http://krebsonsecurity.com/2014/09/in-wake-of-confirmed-breach-at-home-depot-banks-see-spike-in-pin-debit-card-fraud/.
[33] *Id*.
[34] Press Release, The Home Depot, The Home Depot Provides Update on Breach Investigation (Sept. 8, 2014) *available at* https://corporate.homedepot.com/MediaCenter/Documents/Press%20Release.pdf.
[35] Perlroth, *supra* note 25.

55.

The breach itself bore many similarities to the one that occurred at Target, a fact that is damaging for Home Depot. Said one security expert: "Everyone should have learned from what happened to Target … And the fact they haven't should be quite damning."[36]

56.

The breach occurred pursuant to an attack on Home Depot's point-of-sales systems.[37] Hackers infected Home Depot store registers with a new variant of the malicious software (or malware) called "BlackPOS."[38] BlackPOS is designed to siphon data from credit and debit cards when they are swiped at infected point-of-sale systems.[39]

57.

According to security software company, Trend Micro, the new variant of BlackPOS specifically targeted retail accounts such as Home Depot.[40]

---

[36] Martha Kessler, *Attorneys General Launch Multistate Home Depot Data Breach Investigation*, BLOOMBERG BNA, Sept. 11, 2014, http://www.bna.com/attorneys-general-launch-n17179894898/.
[37] Brian Krebs, *Home Depot Hit By Same Malware as Target*, KREBS ON SECURITY, Sept. 7, 2014, http://krebsonsecurity.com/2014/09/home-depot-hit-by-same-malware-as-target/.
[38] *Id.*
[39] *Id.*
[40] *Id.*

58.

The malware likely entered Home Depot's data systems by utilizing a feature that disguises the malware as a component of the antivirus product running on the system.[41]

59.

On September 11, 2014, the new variant of BlackPOS was identified. Security experts named the variant "FrameworkPOS."[42] The name comes from the McAfee antivirus software the malware impersonates.[43] This is important because the method by which FrameworkPOS enters a retailer's data systems is by disguising itself as a McAfee antivirus product – a straightforward Trojan Horse operation.

60.

Home Depot, however, was never deploying McAfee products in its store registers or elsewhere in its network.[44] Thus, when the FrameworkPOS attempted to enter the Home Depot network disguised as McAfee software, Home Depot's

---

[41] *Id.*

[42] Michael Riley & Dune Lawrence, *Home Depot's Malware Hints That Its Hackers Weren't Target's*, BLOOMBERG, Sept. 11, 2014, http://www.bloomberg.com/news/2014-09-11/home-depot-s-malware-details-hint-its-hackers-weren-t-target-s.html.

[43] *Id.*

[44] *Id.*

security team should have been able to easily identify the malware as a network intruder and eliminate the threat.

61.

Instead, Home Depot failed to identify and eliminate the malware, and the FrameworkPOS was allowed to enter the Company's data systems. This is yet another example of a missed opportunity by Home Depot to prevent the data breach.

**The Aftermath of Home Depot's Data Breach**

62.

On September 10, 2014, Attorneys General from five states—California, Connecticut, Illinois, New York, and Iowa—launched a probe into the Home Depot data breach.[45]

63.

On September 11, 2014, two United States Senators—Senator Richard Blumenthal of Connecticut and Senator Ed Markey of Massachusetts—called for the United States Federal Trade Commission to investigate security practices at Home Depot following reports of the data breach.[46]

---

[45] Kessler, *supra* note 36.

[46] Grant Gross, *Senators Call for Investigation of Home Depot Breach*, CSO ONLINE, Sept. 10, 2014, http://www.cso.com.au/article/554644/senators-call-investigation-home-depot-breach/.

64.

Specifically, the Senators accused Home Depot of negligently failing to maintain adequate data security measures, saying: "Given the unprecedented scope and extended duration of Home Depot's data breach, it appears that Home Depot may have failed to employ reasonable and appropriate security measures."[47]

65.

On September 16, 2014, in an attempt to mitigate the massive exposure created by the Home Depot data breach, Visa and MasterCard alerted thousands of card-issuing banks, including numerous Plaintiff and FI Class members, to be on the lookout for fraudulent transactions associated with the breach.[48]

66.

The costs suffered by Plaintiff and the FI Class as a result of Home Depot's data breach are already significant, and will almost certainly increase. Based on prior thefts of customer information, credit card protection firm BillGuard predicts that an

---

[47] *Id.*
[48] Robin Sidel, *Visa, Mastercard Urge Banks to Be Wary After Home Depot Data Breach*, WALL ST. JOURNAL, Sept. 16, 2014, http://online.wsj.com/articles/visa-mastercard-urge-banks-to-be-wary-after-home-depot-data-breach-1410899696.

average of $332 in fraudulent charges will be made using each stolen Home Depot account, for a grand total of $3 billion in fraudulent charges.[49]

## CLASS ACTION ALLEGATIONS

### 67.

Plaintiff brings this action on behalf of itself and all other financial institutions similarly situated and, accordingly, allege all claims herein on a common, class-wide basis, pursuant to Fed. R. Civ. P. 23, 23(a), 23(b)(2) and 23(b)(3).

### 68.

The FI Class is defined as follows:

Financial institutions—including, but not limited to, banks and credit unions—in the United States (including its Territories and the District of Columbia) that issue payment cards, including credit and debit cards, or perform, facilitate, or support card issuing services, whose customers made purchases from Home Depot stores from April 1, 2014 to September 2, 2014. (the "FI Class").

### 69.

Excluded from the FI Class are Home Depot Corporation and any of its parents, affiliates, or subsidiaries as well as any successors in interest or assigns of Home Depot.

---

[49] Mitch Lipka, *Home Depot Hack Could Lead to $3 Billion in Fake Charges*, CBS MONEY WATCH, Sept. 16, 2014, http://www.cbsnews.com/news/credit-monitoring-company-home-depot-breach-could-result-in-2b-in-fraud/

70.

The Plaintiff is a member of the FI Class, as defined above.

71.

The members of the FI Class are readily ascertainable and Home Depot likely has access to addresses and other contact information that may be used for providing notice to FI Class members.

72.

The members of the FI Class are so numerous that joinder of all members would be impracticable. Upon information and belief, the data breach at issue— which affected 56 million credit and debit cards—impacted thousands of financial institutions spread across virtually every geographic region of the United States.

73.

There are substantial questions of law and fact common to the FI Class that predominate over questions affecting only individual FI Class members including, but not limited to, the following:

a.    Whether Home Depot owed a duty to Plaintiff and the FI Class to adequately protect the personal and financial information of its shoppers;

b.      Whether Home Depot breached its duty to protect the personal and financial information of its shoppers by failing to provide adequate security;

c.      Whether Home Depot's conduct (or lack thereof) was the direct and proximate cause of the breach of its systems, which resulted in the loss of millions of consumers' financial data;

d.      Whether Home Depot negligently failed to inform Plaintiff and the FI Class regarding the vulnerabilities of its data protection systems, measures, and practices;

e.      Whether Plaintiff and the FI class suffered financial injury as a result of Defendant's conduct (or lack thereof);

f.      Whether Plaintiff and the FI Class are entitled to injunctive relief; and

g.      What is the appropriate measure of damages sustained by Plaintiff and the FI Class.

74.

Plaintiff's claims are typical of the FI Class. The same event and conduct that give rise to Plaintiff's claims are identical to those that give rise to the claims of every other FI Class member because the Plaintiff is a financial institution that has

suffered harm as a direct and proximate cause of the same, specific Home Depot data breach described herein.

75.

Plaintiff's interests are consistent with and not antagonistic to those of other members of the FI Class.

76.

Plaintiff will fairly and adequately represent the interests of the FI Class. Plaintiff has retained counsel who are experienced and qualified in prosecuting class actions cases similar to this one.

77.

Neither Plaintiff nor its attorneys have any interest contrary to or conflicting with those of other class members of the FI Class.

78.

A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the other FI Class members' claims is economically unfeasible and procedurally impracticable. Litigating the claims of the FI Class together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and unnecessary expense to the parties and the courts.

## COUNT ONE
**(Negligence)**

79.

Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

80.

Home Depot owed a duty to Plaintiff and the FI class to use and exercise reasonable and due care in obtaining, retaining, securing, and deleting the financial information of customers who used credit and debit cards by Plaintiff and the FI Class to make purchases at Home Depot Stores.

81.

Home Depot owed a duty to Plaintiff and the FI Class to provide security, consistent with industry standards and requirements, to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the financial information of customers who used credit and debit cards issued by Plaintiff and the FI Class to make purchases at Home Depot stores.

82.

Home Depot owed a duty of care to Plaintiff and the FI Class because they were a foreseeable and probably victim of any inadequate data security practices. Home Depot solicited, gathered, and stored the sensitive financial data provided by

Plaintiff and the FI Class to facilitate sales transactions with shoppers. Home Depot knew it inadequately safeguarded this information on its computer systems and that sophisticated hackers routinely attempted to access this valuable data without authorization. Home Depot knew that a breach of its systems would inflict millions of dollars of damage upon Plaintiff and the FI Class, and Home Depot was therefore charged with a duty to adequately protect this critically sensitive information.

83.

Home Depot maintained a special relationship with Plaintiff and the FI Class. The FI Class entrusted Home Depot with the financial information of customers using credit and debit cards issued by Plaintiff on the premise that Home Depot would safeguard this information, and Home Depot was in a position to protect against the harm suffered by the FI Class as a result of the data security breach.

84.

In light of its special relationship with Plaintiff and the FI Class, Home Depot knew, or should have known, of the risks inherent in collecting and storing the financial information of shoppers using credit and debit cards issued by Plaintiff and the FI Class, and the importance of providing adequate security of that information.

85.

Home Depot's own conduct also created a foreseeable risk of harm to the FI Class. Home Depot's misconduct included, but was not limited to, failing to update its data security systems despite receiving numerous warnings that it was outdated, inadequate, and in desperate need of overhaul. Home Depot's misconduct also included its decision not to comply with industry standards for the safekeeping and maintenance of customers' financial information.

86.

Home Depot breached the duties it owed to Plaintiff and the FI Class by failing to exercise reasonable care and implement adequate security protocols—including protocols required by industry rules—sufficient to protect the financial information of customers using credit and debit cards issued by Plaintiff and the FI Class.

87.

Home Depot knew or should have known of the risk that the Company's point-of-sales systems could be attacked using methods similar or identical to those previously used against major national retailers in recent months and years.

88.

Home Depot breached the duties it owed to Plaintiff and the FI Class by failing to properly implement technical systems or security practices that could have prevented the loss of the data at issue.

89.

Home Depot breached the duties it owed to Plaintiff and the FI Class by failing to properly maintain the sensitive personal and financial information of customers using credit and debit cards issued by Plaintiff and the FI Class. Given the risk involved and the amount of data at issue, Home Depot's breach of its duty was entirely unreasonable.

90.

As a direct and proximate cause of Home Depot's negligent conduct, Plaintiff and the FI Class have suffered injury and are entitled to damages in an amount to be proved at trial.

## **COUNT TWO**
### **(Negligent Misrepresentation by Omission)**

91.

Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

92.

Through its Privacy and Security Statement and other actions and representations, Home Depot held itself out to Plaintiff and the FI Class as possessing and maintaining adequate data security measures and systems that were sufficient to protect financial information of shoppers using credit and debit cards issued by Plaintiff and the FI Class.

93.

Home Depot further represented that it would secure and protect the financial information of shoppers using credit and debit cards issued by Plaintiff and the FI Class by agreeing to comply with both Card Operating Regulations and the PCI DSS.

94.

Home Depot knew or should have known that it was not in compliance with the representations made in its Privacy and Security Statement, nor with the requirements of Card Operating Regulations and the PCI DSS.

95.

Home Depot knowingly and deliberately failed to disclose material weaknesses in its data security systems and procedures that good faith and common decency required it to disclose to Plaintiff and the FI Class.

96.

A reasonable business would have disclosed information concerning material weaknesses in its data security measures and systems to Plaintiff and the FI Class.

97.

Home Depot also failed to exercise reasonable care when it failed to timely communicate information concerning the data breach that it knew, or should have known, compromised the financial information of customers using credit and debit cards issued by Plaintiff and the FI Class.

98.

Home Depot's failure to disclose the Company's inadequate security systems was particularly egregious in light of the recent, highly publicized, similar data breaches at other major national retailers in the months and years preceding the Home Depot breach.

99.

Had Plaintiff and the FI Class known that Home depot was not compliant with Card Operating Regulations and the PCI DSS, Plaintiff and the FI Class would have either taken action to prevent their cards from being used for electronically processed purchases or required Home Depot to take immediate corrective action.

100.

As a direct and proximate result of Home Depot's negligent misrepresentations by omission, Plaintiff and the FI Class have suffered injury and are entitled to damages in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of itself and the FI Class, respectfully requests that the Court enter judgment in their favor as follows:

a. certifying the FI Class under Fed. R. Civ. P. 23 and appointing Plaintiff and its counsel to represent the Class pursuant to Fed. R. Civ. P. 23(g);

b. awarding Plaintiff and the FI Class monetary damages as allowable by law;

c. awarding Plaintiff and the FI Class appropriate equitable relief;

d. awarding Plaintiff and the FI Class pre-judgment and post-judgment interest;

e. awarding Plaintiff and the FI Class reasonable attorneys' fees and costs as allowed by law; and

f. awarding all such further relief as allowable by law.

## **JURY TRIAL DEMANDED**

Plaintiff, on behalf of itself and the FI Class, demand a trial by jury on all issues so triable.

Dated:  October 9, 2014

       Respectfully submitted,

                        **W. PITTS CARR & ASSOCIATES**

                        By: *s/ Pitts Carr*
                        W. Pitts Carr
                        Georgia Bar No. 112100
                        Alex D. Weatherby
                        Georgia Bar No. 819975
                        10 North Parkway Square
                        4200 Northside Parkway NW
                        Atlanta, GA 30327
                        Tel: (404) 442-900
                        Fax: (404) 442-9700
                        pcarr@wpcarr.com
                        aweatherby@wpcarr.com

                        Charles S. Zimmerman
                        Brian C. Gudmundson
                        **ZIMMERMAN REED, PLLP**
                        1100 IDS Center
                        80 South 8th Street
                        Minneapolis, MN  55402
                        Tel:  (612) 341-0400
                        Fax: (612) 341-0844
                        charles.zimmerman@zimmreed.com
                        brian.gudmundson@zimmreed.com
                        (*Pro Hac Vice Application Forthcoming*)

                        ***Attorneys for Plaintiff and the Proposed Class***